Douglas NELSON, Plaintiff-Appellant,

v.

Gary MACHUT, Defendant-Respondent.

Court of Appeals

*No. 84–1136. Submitted on briefs November 12, 1986.—Decided March 26, 1987.*

(Also reported in 405 N.W.2d 776.)

For the plaintiff-appellant the cause was submitted on the briefs of *Douglas Nelson,* pro se, of Las Vegas, Nevada.

For the defendant-respondent the cause was submitted on the brief of *Linda M. Clifford* and *La Follette, Sinykin, Anderson & Munson,* of Madison.

Before Gartzke, P.J., Eich and Myse, JJ.

EICH, J.   Douglas Nelson appeals from a judgment assessing attorney fees against him pursuant to

the "frivolous action" statute, sec. 814.025, Stats. The issues are: (1) whether the testimony of an attorney expert witness as to the reasonableness of the fees charged must be disregarded because his office is not in the county in which the action arose; (2) whether the trial court erred in determining that Machut's total fees for defending the action were reasonable; (3) whether the fact that Machut prevailed on only one of two alternative grounds stated in his motion to dismiss requires the court to apportion the award of fees; (4) whether Nelson's appeal is itself frivolous, in whole or in part; and (5) whether Nelson should be assessed double costs for failing to comply with the Rules of Appellate Procedure.

We conclude that the expert witness was competent to testify despite his out-of-county residence, and that the trial court did not abuse its discretion in ruling on the reasonableness of the fees. We also conclude that the court was not required to apportion the fees as a result of its decision on Machut's motions, and that Nelson's appeal is frivolous. Finally, we assess double costs against Nelson for violating the Rules of Appellate Procedure.

The facts are not in dispute. Nelson sued Machut for defamation, and the case lay dormant for several years. Machut then filed three motions: a motion for judgment on the pleadings based on the privileged nature of the alleged defamatory communication; a motion for attorney fees under sec. 814.025, Stats., and a motion to dismiss for failure to prosecute. After receiving briefs, the trial court granted the first two motions and denied the third. The court then proceeded to assess fees against Nelson without further hearing, and Nelson appealed. We affirmed the trial court's rulings on the motion for judgment on the

pleadings and on the frivolousness of the action, but we remanded with directions to determine the reasonableness of the fees. The trial court held further hearings and made the award which is the subject of this appeal. Other facts will be discussed below.

## I. EXPERT WITNESS

Machut's expert witness on the reasonableness of his attorney fees was a lawyer from another county. Nelson argues, without citing any authority, that "[i]t is the law in Wisconsin and elsewhere that [such a witness must] be an attorney practicing in the county where he is asked so to testify." Because it is undisputed that the witness had practiced in Dane County, the only basis for Nelson's challenge must be that the witness has no office in the county. The argument is without merit.

The witness was competent to give his opinion. A trial lawyer experienced in defamation actions, he was president-elect of the State Bar of Wisconsin and had a statewide practice. He had practiced in Dane County, and was "very familiar" with both the standards of practice and attorneys' billing practices in the county. The witness's competency to give expert testimony was established beyond question.

## II. REASONABLENESS OF THE FEE

Section 814.025(1), Stats., provides that if an action is found to be frivolous, as that term is defined in the statute, the court "shall award to the successful party costs ... and reasonable attorney fees." In *Standard Theatres v. Transportation Dept.*, 118 Wis. 2d 730, 747, 349 N.W.2d 661, 671 (1984), the supreme

court stated that a trial court's valuation of attorney fees "will be sustained unless there is an abuse of discretion." Once the facts are found, however, reasonableness is usually a question of law. *Wassenaar v. Panos,* 111 Wis. 2d 518, 525, 331 N.W.2d 357, 361 (1983). But where the question is the reasonableness of attorney fees, we have recognized an alternative approach. We view the question as one of law, but give weight to the trial court's determination. *State Bank of Hartland v. Arndt,* 129 Wis. 2d 411, 423 n. 3, 385 N.W.2d 219, 225 (Ct. App. 1986). This approach is consistent with the court's discussion of trial court deference in *Standard Theatres:*

> We believe that the trial court is in an advantageous position to make a determination as to the reasonableness of a firm's rates. This is because the trial court may be aware of the costs incurred by a firm in managing its legal practice, or is capable of asking to be made aware of them. As this court noted in *Tesch v. Tesch,* 63 Wis. 2d 320, 335, 217 N.W.2d 647 [, 654] (1974).

> "[The trial judge] has observed the quality of the services rendered and has access to the file in the case to see all of the work which has gone into the action from its inception. He has the expertise to evaluate the reasonableness of the fees with regard to the services rendered." *Id.,* 118 Wis. 2d at 747, 349 N.W.2d at 671.

Nelson argues that there was no evidence from which the trial court could conclude that the fees were reasonable. We disagree. The case was tried by Attorney Linda Clifford, then an associate in a Madison law firm. Clifford's work was closely supervised on a near-

daily basis by Attorney Brady Williamson, a firm partner with extensive experience in the trial of defamation cases. Williamson reviewed all of Clifford's time slips and every pleading, motion paper and brief, and he reviewed and adjusted all client billings. He discussed the factors that went into determining the amount of Machut's bills, and stated that in his opinion the charges were reasonable. All of the time slips, bills and written narrative summaries of the work done for Machut were received in evidence without objection, and Nelson's cross-examination revealed little more than that Williamson did not actually watch Clifford work on the case to see whether she was keeping accurate time records.

Attorney Gregory Conway was Machut's expert witness, and his qualifications have already been discussed. Conway testified that the charges to Machut were reasonable, if somewhat on the low side. He based his opinion on his knowledge and experience, and his review of the files in the case. Nelson's cross-examination was essentially limited to establishing that Conway had no actual knowledge that Clifford's and Williamson's billed hours were accurately or honestly reported, and that he could not say whether a charge of $1.96 for a single telephone call was actually charged by the telephone company, and, if so, whether the company's rates were themselves reasonable.

Nelson himself was his only witness, and he testified briefly. He is an attorney who had served for a time as a small claims judge, and had practiced in Madison for some fifty years. In Nelson's view, Clifford's and Williamson's charges were unreasonable. In support of his opinion, he filed affidavits stating that he had been able to read a legal file and several cases

and texts in less time than that billed by Clifford for similar work.

The trial court, after considering the evidence and reviewing the case file, concluded that the fees charged to Machut were "more than reasonable" in light of the unusually large number of motions and briefs filed by Nelson and considering also Williamson's and Clifford's professional skills, experience and standing in the legal profession. The trial court considered appropriate factors and we see no error in its determination that the fees were reasonable.

## III. APPORTIONMENT

Nelson points out that the trial court's award represents Machut's attorney fees for all work done on the case, and he contends that because their "failure to prosecute" argument was not accepted by the court, he should not be liable for any fees relating to that aspect of the case. However, all of Nelson's claims were found to be frivolous; and on this record we see no need to apportion the fees.

In some cases, apportionment between frivolous and nonfrivolous claims is appropriate:

> Although there is no express authority in sec. 814.025, Stats., to separately consider the frivolousness of various claims which constitute an action, we conclude that a reasonable and sensible reading of the statute requires such an approach. To conclude otherwise would frustrate the obvious purpose of the statute. Were we to accept the Stolls' argument, a party could assert a marginally meritorious claim and numerous frivolous claims but yet avoid the statute's sanctions. This interpretation is unreasonable because it allows for the very abuse of the judicial system that the statute

seeks to prevent. Unreasonable and absurd consequences in the application of the statute are to be avoided even where the language of the statute conveys a plain meaning.

A more reasonable interpretation allows the trial court to determine the frivolousness of the various claims constituting an action or a defense. The purpose of sec. 814.025, Stats., is thereby fulfilled. We therefore agree with the trial court's determination that it could properly find some claims within an action frivolous and some not frivolous. [Citations omitted.] *Stoll v. Adriansen*, 122 Wis. 2d 503, 511–12, 362 N.W.2d 182, 187 (Ct. App. 1984)

In this case, Machut's motion, in addition to seeking frivolous action costs, sought dismissal of the action on alternative grounds that: (1) it was legally meritless because the allegedly defamatory statement was absolutely privileged; and (2) Nelson had failed to prosecute the action for five years. The trial court's memorandum decision focused on the first issue and, after a reasoned discussion of the facts and law, ruled in Machut's favor. In response to the claim of lack of prosecution, the court simply noted that because Nelson had, on several occasions, requested that the action be advanced on the calendar, there was no failure to prosecute. This comment appears in the middle of a lengthy opinion, and because Machut's trial briefs are not part of the record, we do not know what efforts may have been expended by his counsel on this aspect of the motion. We need not pursue the point, however, for we do not believe the apportionment requirement of *Stoll* applies to the facts of this case.

Machut's three-part motion was a response to a frivolous lawsuit. It sought dismissal on two alternative grounds and it requested fees under sec. 814.025, Stats. As indicated, the trial court dismissed the action on only one of the two grounds advanced—the ground that really was the primary basis of the motion—and agreed that the action was frivolous. We affirmed both rulings.

The fact that Nelson's action may not have been subject to dismissal for lack of prosecution has nothing to do with whether it was frivolous. All legal claims advanced by Nelson in his lawsuit were held to be frivolous, and they do not become any less so because the trial court based its decision to dismiss on one of two alternative grounds put forth by Machut.

## IV. FRIVOLOUS APPEAL

We may assess fees and costs on appeal in two circumstances under sec. (Rule) 809.25(3)(c), Stats.

> 1. The appeal or cross-appeal was filed, used or continued in bad faith, solely for purposes of harassing or maliciously injuring another [or]
>
> 2. The party or the party's attorney knew, or should have known, that the appeal or cross-appeal was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.

Nelson, an attorney of many years' standing, should have known that there was no reasonable basis for the appeal. The "abuse of discretion" standard of review of trial court decisions is well-known, and is difficult to overcome in the best of cases. Here, the

testimony of Williamson and Conway was extensive and to the point. Nelson's cross-examination of both witnesses was cursory, and he voiced no objection to the admission of Machut's documentary evidence. His evidence was limited to a brief statement of his own opinion that the fees were unreasonable. The sole support for that opinion consists of two affidavits in which Nelson states his feeling that Clifford should have spent less time on some of the work she billed to Machut. In addition, Nelson's unsupported argument on Conway's competence to testify, and his assertions that the award should somehow be apportioned because the trial court did not adopt every legal argument advanced by Machut to defeat the action, have no basis in law; and his failure to cite authorities to back up these propositions is further evidence of their lack of reasonable merit.

Machut asks for double costs under sec. (Rule) 809.83(2), Stats., for failure to comply with the Rules of Appellate Procedure. He asserts that: Nelson filed his appendix more than three weeks after his brief, in violation of secs. (Rules) 809.19(1) and (2); he failed to include in his initial brief a statement on argument and publication in violation of sec. (Rule) 809.19(1)(c); and he failed to follow the Uniform System of Citation in violation of sec. (Rule) 809.19(1)(e). Machut also claims that Nelson failed to paginate his appendix or include crucial damaging testimony, requiring Machut to prepare and file a supplemental appendix. Nelson does not dispute these violations and, because of their number, we believe they are deserving of sanction.

We conclude, therefore, that Nelson's appeal was frivolous in its entirety within the meaning of sec.

(Rule) 809.25(3), Stats. We also conclude that Nelson should be subject to the sanctions of sec. (Rule) 809.83(2) for multiple violations of the Rules of Appellate Procedure, and we therefore award respondent double costs on the appeal. We remand to the trial court for a determination of the fees and costs to be awarded.

*By the Court.*—Judgment affirmed and cause remanded for further proceedings consistent with this opinion.

IN the MATTER OF the DISCIPLINARY PROCEEDINGS AGAINST Phillip DOERSCHING and Smith-Jorris and Doersching Funeral Home: Phillip DOERSCHING, Petitioner-Respondent,

v.

STATE of Wisconsin FUNERAL DIRECTORS & EMBALMERS EXAMINING BOARD, Appellant.

Court of Appeals

*No. 85–1612. Submitted on briefs October 17, 1986.—Decided March 26, 1987.*

(Also reported in 405 N.W.2d 781.)

For the appellant the cause was submitted on the briefs of *Bronson C. La Follette,* attorney general, and *William H. Wilker,* assistant attorney general.

For the petitioner-respondent the cause was submitted on the brief of *John H. Short* and *Vance, Wilcox, Short, Johnson & Ristow, S.C.,* of Fort Atkinson.

Before Gartzke, P.J., Eich and Sundby, JJ.

GARTZKE, P.J.   The Funeral Directors Examining Board revoked Phillip Doersching's licenses as a funeral director and embalmer for having badly botched a funeral. More specifically, the board concluded he was guilty of gross negligence, outrageous conduct and failure to provide a disclosure agreement before performing services, contrary to the board's published rules and sec. 445.13, Stats. The circuit court reversed the revocation and remanded the matter to the board for a rehearing on the outrageous conduct issue and for reconsideration of the revocation. The board has appealed.

Doersching's gross negligence and failure to provide the disclosure agreement are uncontested on appeal. The questions before us are whether substantial evidence supports certain of the board's factual findings, whether the board could conclude that Doersching's conduct was outrageous and whether the decision to revoke his licenses was a proper exercise of the board's discretion. We affirmatively answer all questions and therefore reverse the trial court and affirm the order of the Examining Board.

316

Section 445.13, Stats., empowers the board to limit, suspend or revoke licenses of funeral directors and embalmers for any violation of ch. 445, Stats., or of any rule of the Department of Health and Social Services or the Examining Board or for unprofessional conduct. Wisconsin Adm. Code secs. FDE 3.01(5) and (9) declare that gross negligence and outrageous conduct constitute unprofessional conduct.[1]

[1]Section 445.13(1), Stats., provides:

Subject to the rules promulgated under s. 440.03(1), the examining board may ... suspend or revoke licenses of funeral directors, ... and reprimand funeral directors, ... for any violation ... of this chapter or of any rule of the department of health and social services or the examining board or for unprofessional conduct, including misrepresentation or fraud in obtaining the license, permit or certificate of registration.

Section 445.01(5), Stats., provides: "A 'funeral director' means ... : (a) A person engaged in or conducting, or holding himself or herself out, in whole or in part, as being engaged in embalming or otherwise preparing for the burial or disposal, or directing and supervising the burial or disposal, of dead human bodies."
Wisconsin Adm. Code sec. FDE 3.01 provides in part:

Any occurrence of the following shall constitute unprofessional conduct by a licensed funeral director, embalmer or registered apprentice funeral director or embalmer or owner of a funeral establishment.
. . . .
(5) Gross negligence in properly providing and performing the services of funeral directing or embalming for which the individual is duly licensed.
. . . .
(9) Outrageous conduct in the practice of the profession exceeding all bounds usually tolerated by decent society.

## BOARD'S FORMAL FINDINGS AND CONCLUSIONS

Following a hearing before an examiner, the board found that Doersching practiced in Palmyra, where he owned the Smith-Jorris and Doersching Funeral Home. On the morning of June 7, 1980, Arnulfo Rocha was killed in an automobile accident and taken to a Ft. Atkinson Hospital. The Rocha family wanted Doersching to make the funeral arrangements. Doersching arranged for the director at a Cambridge funeral home to remove the body from the hospital and embalm it.

The body had a large open skull fracture, a small cut near the nose, and an apparent chest compression. The hair contained blood and broken glass. Before embalming the body, the Cambridge director washed the face, removed some glass from the hair and sutured the small cut. When embalming the body, he made six incisions plus the cavity injection.

The same day Doersching met the Rocha family at their residence. They told him they wanted the body shipped to the Sanchez Funeral Home in Nuevo Laredo, Mexico, for burial. During a second meeting that morning at his Palmyra funeral home, Doersching told Roberto, decedent's brother, that because of the extent of the injuries to decedent, there should be a closed casket funeral. Roberto told Doersching that the family wanted an open casket funeral. Doersching told Roberto about the arrangements to ship the body to Mexico and requested payment for the funeral in advance. Doersching never provided the family with a funeral purchase agreement.

A third meeting was held on June 7, 1980, at Doersching's funeral home. Loren Jorris, a director of

the home, and the family were present. The family paid Jorris for the funeral arrangements and the widow provided him with a suit of clothes for the body.

Doersching received the body at the Cambridge funeral home the afternoon of June 7. The Cambridge director had completed the embalming and had sutured the brachial and femoral incisions, but had not sutured the carotid incisions and had not sutured or otherwise closed the head wound. Doersching knew of these circumstances when he removed the body.

Doersching transported the body to his Palmyra funeral home where he put the nude body in two large plastic trash bags, one drawn over the head and the other over the feet, wrapped the body in a flannel sheet and put it in a casket. He did not put the clothes provided by the Rocha family in or with the casket. He did not suture the carotid incisions, suture or otherwise close the head wound, further wash or clean the hair or undertake any further embalming procedure.

Sunday morning, June 8, 1980, Doersching took the casket to an air freight office in Milwaukee. The plane containing the casket arrived in Laredo, Texas, on the evening of the next day. In accordance with Doersching's prior arrangements, the casket was transported that evening to the Sanchez Funeral Home in Nuevo Laredo, Mexico.

The Rocha family was at the Sanchez funeral home when the body arrived. The widow asked that the casket be opened to permit identification of the decedent. The embalming had not been entirely successful. Some decomposition of the body was apparent.

The board found that minimum standards for practices of funeral directors in Wisconsin in June 1980 required Doersching, as the funeral director

retained to prepare the body for burial in Mexico, to properly embalm or to ensure its proper embalming, ensure that all embalming incisions and other traumatic injuries were properly sutured or otherwise closed, and ensure that the body was properly clothed or otherwise appropriately contained and enclosed for shipment and disposition at its final destination. The board found that Doersching failed to meet every one of those requirements.[2]

The board concluded that Doersching had engaged in gross negligence in failing to properly provide services as funeral director or embalmer and had engaged in outrageous conduct in the practice of the profession exceeding all bounds usually tolerated by decent society, contrary to Wis. Adm. Code secs. FDE 3.01(5) and (9) and sec. 445.13(1), Stats. The board also concluded that by failing to provide a disclosure agreement to the Rocha family, Doersching violated Wis. Adm. Code sec. FDE 2.15(2)[3] and sec. 445.13(1).

---

[2]The board appears to have used "insure" and "ensure" interchangeably. The context is such that we infer it intended to use "ensure" rather than imply a duty to indemnify.

[3]Wisconsin Adm. Code sec. FDE 2.15(2) provides:

> At the time tentative funeral arrangements are completed and the casket is selected, but prior to the time of rendering the service and/or providing the casket and/or merchandise and before final agreement is reached between the consumer and the funeral director, the funeral director shall give or cause to be given to the persons making the arrangements a written disclosure showing:
>
> (a) The price of the service that the family has selected and what services are included therein.
>
> (b) The price of each of the supplemental items of service and/or merchandise requested.
>
> (c) The amount involved for each of the items for which the funeral director will advance monies as an accommodation to the

The board ordered revocation of Doersching's licenses to practice as a funeral director and embalmer in Wisconsin.

## CIRCUIT COURT'S DECISION

Doersching sought judicial review of the board's order under ch. 227, Stats. The circuit court concluded there was no evidence (1) that Doersching understood or agreed to prepare the body for an open casket funeral, (2) that he knew that the family had delivered clothes for the body to his funeral home, (3) that he had possession of clothing for the body before shipping it to Texas, (4) of an error or omission by him which caused the embalming procedure to be less than successful, and (5) that the average member of the community would consider Doersching's conduct outrageous. The court said that some of the family's distress was caused by the failure of the Mexican funeral director to inspect the body, and that a perfectly prepared body could have arrived in Mexico in less than perfect condition.

The circuit court concluded that the evidence supported the board's finding that gross negligence but not outrageous conduct had occurred, and that the board had failed to distinguish between gross negligence and outrageous conduct. The court concluded

family, insofar as any of the above items can be specified at that time.

(d) When after reviewing the written disclosure and making the casket selection and both parties agree to the final arrangements, a copy of the disclosure must be signed by the funeral director and the signed copy given to the consumer. It is recommended that the persons making the arrangements also sign the disclosure to show approval of the arrangements.

that the penalty of revocation was insufficiently related to Doersching's conduct.

## SCOPE OF APPELLATE REVIEW

We have summarized the opinion of the trial court because the issues center on its reasoning. We nevertheless review only the board's decision rather than the trial court's opinion, even though the court's opinion sharpens the issues. We review the board's findings, conclusions and order independently of and with no deference to the opinion of the lower court. *Boynton Cab Co. v. ILHR Department,* 96 Wis. 2d 396, 405, 291 N.W.2d 850, 855 (1980). In fewer words, our appellate review is *ab initio. Id.*

The scope of review, by the trial court and this court, is defined in sec. 227.57, Stats.[4] We will set aside or modify agency action if the agency has erroneously interpreted a provision of law. Sec. 227.57(5), Stats. We may not substitute our judgment for that of the agency as to the weight of the evidence on any disputed finding of fact, but we must set aside its action or remand the case to the agency if its action depends on a finding of fact that is not supported by substantial evidence in the record. Sec. 227.57(6). We are not to substitute our judgment for that of the agency on an issue of discretion, sec. 227.57(8), and we must accord due weight to the experience, technical competence and specialized knowledge of the agency as well as to its discretionary authority. Sec. 227.57(10).

---

[4]All statutes referred to herein are from the most recent revision, 1985 a. 182.

## EVIDENTIARY BASIS FOR BOARD'S FINDINGS

The substantial evidence test is met if the evidence, including the inferences from it, is such that a reasonable person might have made the same finding as did the agency. *Bucyrus-Erie Co. v. ILHR Department*, 90 Wis. 2d 408, 418, 280 N.W.2d 142, 147 (1979). Substantial evidence may support conflicting findings, and if it does, we must accept the agency's choice, notwithstanding the reasonableness of contrary findings. *Robertson Transport. Co. v. Public Serv. Comm.*, 39 Wis. 2d 653, 658, 159 N.W.2d 636, 638 (1968).

We turn first to Doersching's contention that no evidence supports a finding that he understood the family wanted an open casket funeral or that he agreed to such a funeral. The board made no formal finding to either effect, but that is not critical if we may infer that the agency made an unexpressed finding. *Valadzic v. Briggs & Stratton Corp.*, 92 Wis. 2d 583, 591, 286 N.W.2d 540, 543–44 (1979). When discussing its findings and conclusions, the board said that Doersching failed to complete preparation of the body despite his knowledge that the family anticipated an open casket funeral. The evidence supports that finding. The board heard testimony that the family told him it wanted an open casket. The board noted that Doersching's testimony failed directly to address the issue. Under those circumstances, whether he expressly agreed to provide an open casket funeral is immaterial.

The validity of the board's order is unaffected by the lack of substantial evidence of an error or omis-

sion by Doersching which caused the embalming to be less than successful. The board found that the minimum standards for practice as a funeral director in Wisconsin require that Doersching either properly embalm or ensure the proper embalming of the body. The existence and nature of professional standards are facts susceptible to proof through the testimony of persons within the profession. *Carson v. Beloit,* 32 Wis. 2d 282, 293, 145 N.W.2d 112, 117 (1966). Expert testimony supports the finding that minimum standards require that funeral directors either properly embalm or ensure the proper embalming of bodies committed to their care. Substantial evidence exists that Doersching did not ensure that the body was properly embalmed. By the time it arrived in Mexico, it had begun to decompose.

The validity of the order is unaffected by the lack of a finding that Doersching knew the family had delivered a bag of clothing to Jorris. The board heard expert testimony that the standards of the profession required Doersching to ensure that that body was properly clothed or otherwise appropriately contained. The board had evidence that the body must be, at a minimum, covered by underwear. The body was completely unclothed. Doersching covered the head and feet with trash bags.

We reject as irrelevant the possibility that even if the body had been superbly prepared after a perfect embalming, "something" could have happened to it on its journey. No evidence was offered of an intervening event which excused Doersching's failures. We also reject as irrelevant the suggestion that the Mexican funeral director could have saved the family some

324

grief and pain had he inspected the body before permitting them to see it.

Finally, we reject the contention that to support the conclusion of outrageous conduct, the record should show how the average person would regard Doersching's grossly negligent conduct. How the average citizen would react to particular facts is generally left to the factfinder without expert evidence or poll results. For example, how a reasonable person would have reacted is an everyday question in civil and criminal trials. Expert testimony on the question is rarely required. We do not require it here.

## GROSS NEGLIGENCE AND OUTRAGEOUS CONDUCT

A person's behavior is a fact. Whether that behavior meets a legal standard of propriety or acceptability is a question of law. Whether conduct is grossly negligent or outrageous is therefore a question of mixed fact and law. Cf. *Millonig v. Bakken,* 112 Wis. 2d 445, 450, 334 N.W.2d 80, 83 (1983) (negligence is a question of mixed fact and law). If, as here, the historical facts have been established, whether conduct is grossly negligent and outrageous within the meaning of the board's regulations, Wis. Adm. Code secs. FDE 3.01(5) and (9), is solely a question of law.

We independently review administrative agency decisions on issues of law, although we may defer to the agency's reasonable interpretation of its own regulation. *Beal v. First Fed. Sav. & Loan Asso. of Madison,* 90 Wis. 2d 171, 183, 279 N.W.2d 693, 698 (1979). Because, however, the board did not separately

discuss gross negligence and outrageous conduct, and the board's regulations define neither term, we first examine the nature of two standards and then apply them to the facts without deferring to the board's conclusions.

Gross negligence has been jettisoned from the common law of this state, but it usually means a high degree of ordinary negligence. *Bielski v. Schulze,* 16 Wis. 2d 1, 17, 114 N.W.2d 105, 113 (1962). We conclude that gross negligence in Wis. Adm. Code sec. FDE 3.01(5) is used in that sense.

Outrageous conduct is usually compared to ordinary negligence. When that is the comparison, conduct is outrageous when the actor knows that he or she has acted without ordinary care but nevertheless proceeds in that conduct in reckless or conscious disregard of the consequences. *Brown v. Maxey,* 124 Wis. 2d 426, 433, 369 N.W.2d 677, 681 (1985). The authors of Wis. Adm. Code secs. FDE 3.01(5) and (9) must have intended to compare outrageous conduct with grossly negligent conduct. For purposes of those regulations, we conclude that conduct is outrageous when a person knows that he or she has acted with a high degree of negligence but nevertheless persists in that conduct in reckless or conscious disregard of the consequences.

We conclude that for purposes of Wis. Adm. Code sec. FDE 3.01(5), Doersching was grossly negligent in that he failed to ensure that the body was properly embalmed, that all embalming incisions and the head wound were properly sutured or otherwise closed, and that the body was properly clothed or otherwise

appropriately contained. Whether those omissions, in and of themselves, constituted a high degree of ordinary negligence we need not decide. Doersching had actual knowledge of his omissions (except, perhaps, of the faulty embalming) and that this was to be an open casket funeral. His failure to make good his known omissions when he knew an open-casket funeral would occur exhibited a high degree of negligence, even an indifference. Doersching was grossly negligent.

For purposes of Wis. Adm. Code sec. FDE 3.01(9), Doersching's subsequent actions were outrageous. He must have known the inevitable effect upon the family were they to see the body as he left it. He nevertheless shipped the body for presentation to the family. He therefore persisted in his grossly negligent conduct in disregard of the inevitable shock to the widow and the family. His conscious disregard of that consequence exceeds all bounds usually tolerated by decent society and is nothing less than outrageous.

## DISCIPLINARY ACTION BY THE BOARD

Because Doersching's conduct was grossly negligent and outrageous, contrary to Wis. Adm. Code secs. FDE 3.01(5) and (9), those regulations declare that his conduct was unprofessional. It was unprofessional for the additional reason that he failed to provide the disclosure required by Wis. Adm. Code sec. FDE 2.15(2), a failure which is uncontested.

Section 445.13(1), Stats., provides that the board may limit, suspend or revoke licenses of funeral directors and embalmers for any violation of the rules of the examining board or for unprofessional conduct.

The board's authority to choose between limitation, suspension or revocation is discretionary. We must accord due weight to the "discretionary authority conferred upon" the agency. Sec. 227.57(10), Stats. We accord that weight by sustaining an agency's discretionary decision unless it has abused its discretionary power.

The scope of judicial review for abuse of discretion is settled. The reviewing court may look no further than to determine whether the decisionmaker examined the relevant facts, applied a proper standard of law, and reached a reasonable conclusion. *Loy v. Bunderson,* 107 Wis. 2d 400, 414–15, 320 N.W.2d 175, 184 (1982).

Doersching nevertheless contends that the decision to revoke his licenses is improper. He relies on *Gilbert v. Medical Examining Board,* 119 Wis. 2d 168, 349 N.W.2d 68 (1984), and *Strigenz v. Department of Regulation,* 103 Wis. 2d 281, 307 N.W.2d 664 (1981). He states that to revoke a professional license, an agency must find on the basis of substantial evidence that the practitioner is unable to perform his or her profession at a minimal standard, as determined by a consensus of professional opinion. Because the record lacks such evidence, in his view nothing supports the imposition of any discipline upon him, but if such evidence exists, it does not support revocation of his licenses.

The state's purpose in licensing professionals is to protect its citizens. *Strigenz,* 103 Wis. 2d at 286, 307 N.W.2d at 667. License revocation is the ultimate means of protecting the public short of fining or imprisonment.

We reject the proposition that inability to perform a licensed profession at minimal standards is the sole basis for revocation. Were that the rule, then the competent but dishonest practitioner could prey on the public until death or retirement.

Neither *Gilbert v. Medical Examining Board, supra,* nor *Strigenz v. Department of Regulations, supra,* hold that to revoke a professional license an agency must find that the practitioner is unable to perform at a minimal standard. The *Gilbert* court held that the medical examining board must have evidence on the level of minimum competence to revoke a license to practice medicine when the charge was that the physician had engaged in conduct which tended to constitute a danger to the health, welfare or safety of the patient or public. 119 Wis. 2d at 204–05, 349 N.W.2d at 84. The *Strigenz* court held that statutory authority to discipline a licensed dentist for unprofessional conduct included authority to discipline for failure to meet minimum standards of acceptable dentistry, even without enactment of specific rules prohibiting such acts. 103 Wis. 2d at 291, 307 N.W.2d at 669. Neither the *Gilbert* nor the *Strigenz* decisions even hinted that whatever the grounds for revocation, that sanction is unavailable in the absence of evidence that the practitioner cannot perform at a minimal standard.

We turn to the board's rationale for revocation. The examiner had recommended that Doersching's licenses be suspended for one year. The board disagreed. The board concurred in the examiner's determination that the serious conduct in this case evinced an indifference to the conventional perception of

appropriate treatment of the dead and to the feelings of the family of the deceased, and that such conduct violated fundamental principles upon which the profession was based. The board concluded that it must emphasize to its licensees the serious nature of the misconduct found in the case and must render disciplinary measures coextensive with an effective public disapproval of the conduct. In the board's opinion, nothing short of revocation would offer sufficient recognition of the unprofessional conduct involved or adequately protect the public from similar misconduct by others.

The board made a deliberate choice between suspending or revoking Doersching's licenses. When deciding that the harshest discipline was necessary, the board examined the relevant facts, applied a proper standard of law and reached a reasonable conclusion. Once we determine, as we do, that the board's decision meets this standard, we can go no further. *Loy v. Bunderson,* 107 Wis. 2d at 414–15, 320 N.W.2d at 184. Because we conclude that the board did not abuse its discretion, judicial review is exhausted. The board's order must be affirmed.

*By the Court.*—Judgment reversed and cause remanded with directions to affirm the order of the board.

The examiner found, and the board concurs, that the serious misconduct in this case evinces an indifference both to the conventional perception of appropriate treatment of the dead and to the feelings of the family of the deceased. Such conduct is violative of the fundamental principles upon which the profession is based.